A-570-985
Remand
Slip Op. 23-53
POR:  07/01/2019–06/30/2020
**Public Version**
E&C/OIV:  SMB

***Meihua Group International Trading (Hong Kong) Limited v. United States*,
Court No. 22-00069, Slip Op. 23-53 (CIT April 19, 2023)
Xanthan Gum from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*Meihua Group International (Hong Kong) v. United States*.[1]  This litigation pertains to certain

issues in the final results of the administrative review of the antidumping duty (AD) order on

xanthan gum from the People's Republic of China (China), covering the July 1, 2019, through

June 30, 2020, period of review (POR).[2]

The CIT remanded Commerce to reconsider its:  (1) application of adverse facts available

(AFA) to Meihua; (2) decision not to rescind the review of Deosen Biochemical Ltd. (Deosen

Biochemical), and, in doing so, reconsider whether Deosen Biochemical and Deosen

Biochemical (Ordos) Ltd. (Deosen Ordos) (collectively, Deosen) should be collapsed into a

single entity; and (3) calculation of the separate rate.[3]  Consistent with the CIT's opinion, on

remand, we find that:  (1) Commerce's application of AFA to Meihua is appropriate; (2) because

---

[1] *See Meihua Group International (Hong Kong) v. United States*, Consol. Court No. 22-00069, Slip Op. 23-53 (CIT April 19, 2023) (*Remand Order*).
[2] *See Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 7104 (February 8, 2022) (*2019-20 Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 17, 20-21, and 24.

Deosen remains a single entity, Commerce's decision not to rescind its review of Deosen Biochemical is proper; and (3) consequently, Commerce need not recalculate the separate rate.

## II.    BACKGROUND

On February 8, 2022, Commerce published the *2019-20 Final Results*.[4]  Commerce assigned a dumping margin of 154.07 percent, based entirely on AFA, to Meihua, which was a mandatory respondent to this review.  Deosen, a company that was not selected to be a mandatory respondent in this review, was assigned the separate rate, which was based on a simple average of the AFA-based rate assigned to Meihua and the zero rate assigned to Neimenggu Fufeng Biotechnologies Co., Ltd. (aka Inner Mongolia Fufeng Biotechnologies Co., Ltd.); Shandong Fufeng Fermentation Co., Ltd.; and Xinjiang Fufeng Biotechnologies Co., Ltd. (collectively, Fufeng), the other mandatory respondent to this review.  Meihua, Deosen, and Jianlong Biotechnology Co., Ltd. (formerly, Inner Mongolia Jianlong Biochemical Co., Ltd) (Jianlong) subsequently challenged Commerce's *2019-20 Final Results* at the CIT.  On April 19, 2023, the CIT remanded the *2019-20 Final Results* to Commerce to reconsider its:  (1) application of AFA to Meihua; (2) decision not to rescind the review of Deosen Biochemical, and, in doing so, reconsider whether Deosen Biochemical and Deosen Ordos should be collapsed into a single entity; and (3) calculation of the separate rate.[5]

On June 13, 2023, Commerce issued its Draft Results.[6]  On June 23, 2023, we received comments from Deosen, Jianlong, and Meihua.[7]

---

[4] *See 2019-20 Final Results*, 87 FR at 7104.
[5] *See Remand Order* at 17, 20-21, and 24.
[6] *See* Draft Results of Redetermination Pursuant to Court Remand, *Meihua Group International Trading (Hong Kong) Limited v. United States*, Consol. Court No. 22-00069, Slip Op. 23-53 (CIT April 19, 2023), dated June 13, 2023 (Draft Results).
[7] *See* Deosen Letter, "Deosen's Comments on Draft Results of Redetermination Subject to Court Order," dated June 23, 2023 (Deosen Draft Results Comments); Jianlong Letter, " Comments on Draft Results of Redetermination," dated June 23, 2023 (Jianlong Draft Results Comments); and Meihua Letter, "Comments on Draft Remand Redetermination," dated June 23, 2023 (Meihua Draft Results Comments).

III.     **DISCUSSION**

   **A.  Commerce's Application of AFA to Meihua**

On September 3, 2020, Commerce initiated the underlying administrative review.[8]   On

October 28, 2020, Commerce issued the initial questionnaire to Meihua,[9] to which the company

timely responded in November (response to section A) and December (response to sections C

and D) of 2020.[10]   On December 20, 2020, Commerce officials spoke with Meihua's counsel

regarding the company's request for clarification of Appendix V of the Initial Questionnaire

dealing with section 301 duties.[11]   On February 12, 2021, Commerce issued a section C and D

supplemental questionnaire to Meihua.[12]   On February 16, 2021, Commerce officials *again*

spoke with Meihua's counsel regarding the company's request for clarification of question 18 of

the section C and D supplemental questionnaire relating to overhead inputs the company

provided in Exhibit D-12 of its section D initial questionnaire response.[13]   On March 8, 2021,

Meihua responded to Commerce's February 12, 2021, section C and D supplemental

questionnaire.[14]

On March 23, 2021, the petitioner[15] submitted rebuttal factual information comprised of

consignees, including vessel manifest data provided by U.S. Customs and Border Protection

---

[8] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 FR 54983 (September 3, 2020) (*Initiation Notice*).

[9] *See* Commerce's Letters, "Request for Information," dated October 28, 2020 (Initial Questionnaire).

[10] *See* Meihua's Letter, "Response to Section A of Initial Questionnaire," dated November 18, 2020; Meihua's Letter, "Response to Section C of the Department's Initial Questionnaire," dated December 11, 2020 (Meihua's CR); and Meihua's Letter, "Response to Section D of the Department's Initial Questionnaire," dated December 18, 2020.

[11] *See* Memorandum, "Phone Call with Meihua," dated December 20, 2020 (December 20 Memorandum).

[12] *See* Commerce's Letter, "Meihua Sections C and D Supplemental Questionnaire," dated February 12, 2021.

[13] *See* Memorandum, "Clarification on Question 18 of the Sections C and D Supplemental Questionnaire," dated February 16, 2021 (February 16 Memorandum).

[14] *See* Meihua's Letter, "Response to Supplemental Section C/D Questionnaire," dated March 8, 2021 (Meihua's Supplemental CDSR).

[15] The petitioner is CP Kelco U.S., Inc. (the petitioner).

(CBP), and CBP guidelines for reporting consignees.[16]  The petitioner later clarified that its submission revealed discrepancies, which called into question the fundamental nature of Meihua's U.S. sales reporting.[17]

On March 31, 2021, Meihua submitted surrebuttal information, arguing that the petitioner's attempt to report the consignee name used by Meihua at the time of entry was not relevant.  In doing so, Meihua divulged that the company:  (1) [




]; (2) [




]; and (3)

[




].[18]  As Meihua later explained, the consignee information reported to Commerce was the same erroneous consignee information initially reported to CBP.[19]

On May 18, 2021, Commerce issued a second section C and D supplemental questionnaire to Meihua, which included several questions concerning [

---

[16] *See* Petitioner's Letter, "Factual Information to Rebut, Clarify, or Correct," dated March 23, 2021.
[17] *See* Petitioner's Letter, "Resubmission of Meihua Deficiency Comments," dated April 30, 2021 (Petitioner's April 30 Submission).
[18] *See* Petitioner's Letter, "Response to Petitioner's Letter of March 23, 2021," dated March 31, 2021.
[19] *See* Meihua's Letter, "Response to Petitioner's Comments of April 8, 2021," dated April 14, 2021 (Meihua's April 14 Submission).

].[20]  Commerce also requested that Meihua provide

all [                                                                    ].[21]  In its

submission, Meihua responded that it had [

], and provided [                                        ].  Meihua also clarified certain issues with

respect to its named consignees.[22]

Meihua's [

].  According to Meihua:

[

].[23]

Despite conceding [                                                            ],[24]

Meihua:  (1) concealed this fact from Commerce in its initial section A questionnaire response;

and (2) included erroneous information (*i.e.*, [                                        ]) in its section C

---

[20] *See* Commerce's Letter, "Meihua Second Supplemental Sections C and D Questionnaire," dated May 18, 2021
(Commerce May 18 Supplemental).
[21] *Id.*
[22] *See* Meihua's Letter, "Response to Second Supplemental Section C/D Questionnaire," dated June 4, 2021
(Meihua's June 4 CDSSR).
[23] *Id.*
[24] *Id.*

response.[25]  And despite its attempt to "come clean" with Commerce more than 190 days later,

Meihua withheld [                                                  ]; submitting [                                                  ]

262 days later.[26]  Commerce's lack of access to necessary information resulted in further inquiry

by the agency; Meihua's responses, however, were submitted 56 days before the fully extended

signature date of the preliminary results.  Of note, Meihua failed to provide a reliable U.S. sales

database, claiming instead, that the information would not be finalized until after CBP completed

its review, which, according to Meihua, would be well after the *Final Results*.[27]

In the *Preliminary Results*, Commerce found that necessary information was missing

from the record, and that Meihua:  1) withheld information requested by Commerce; failed to

provide that information for the deadline established by Commerce; and 2) significantly impeded

Commerce's proceeding.[28]  Commerce, therefore, found that the application of a factual

inference to was necessary, pursuant to sections 776(a)(1) and 776(a)(2)(A)-(C) of the Tariff Act

of 1930, as amended (the Act).  Commerce also found that Meihua failed to act to the best of its

ability in responding to Commerce's requests for information, warranting the application of total

AFA pursuant to section 776(b) of the Act.[29]  Therefore, and because Meihua's failure to

accurately report requested information impacted the entirety of its reported U.S. sales data,

Commerce applied an adverse inference to calculate a dumping margin for Meihua.  Commerce

---

[25] *See* Meihua's Letter, "Response to Supplemental Section C/D Questionnaire, dated March 8, 2021 (Meihua's Section C Response).
[26] *See* Meihua's June 4 CDSSR.
[27] *See* Meihua's Letter, "Case Brief," dated September 14, 2021 (Meihua's Case Brief) at 9.
[28] *See Xanthan Gum from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 FR 42781 (August 5, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 7-9, unchanged in *2019-20 Final Results*.
[29] *Id.*

selected, as AFA, the highest rate on the record of the proceeding, 154.07 percent, as Meihua's dumping margin.[30]

The CIT remanded to Commerce to reconsider its application of AFA to Meihua, holding that Commerce failed to grant Meihua an opportunity to address deficiencies in its reporting pursuant to section 782(d) of the Act.[31]

**Analysis**

Upon further reconsideration on remand, we find that substantial record evidence, including Meihua's own actions, continue to support Commerce's decision to apply AFA to Meihua.  Additionally, we find that granting Meihua an opportunity to remedy its actions on remand is not only inappropriate, but also fruitless; Meihua *concedes* that it did not possess accurate U.S. duty information during the POR.[32]  Meihua's failure to alert Commerce to the company's misrepresentations until late in the review effectively precluded Commerce from considering the issue.

During the course of an antidumping proceeding, Commerce will often issue supplemental questionnaires that allow respondents to revise or supplement record evidence. Supplemental questionnaires are issued after a review of record information, which Commerce may find confusing, incomplete, requires further explanation, *etc*.  In other words, it is clear to Commerce that record evidence is deficient in some manner and that Commerce needs further information in order to conduct a thorough administrative review.  Further, when Commerce finds that a response to a request for information is not responsive to its request, section 782(d)

---

[30] *Id.*
[31] *See Remand Order* at 17 and 25.
[32] *See* Meihua's Case Brief at i, ii, and 9.

of the Act provides that Commerce must grant parties an opportunity to remedy or explain those deficiencies.

Meihua misrepresented information (*i.e.*, U.S. duties in its U.S. sales database) to Commerce.  Meihua submitted inaccurate information to Commerce on multiple occasions, despite certifying to the contrary.[33]  When Meihua finally made an attempt to rectify its shortcomings, it did so under protest.[34]

Commerce's initial questionnaire includes a section that encourages respondents to contact the Commerce officials in charge of the review if respondents encounter difficulties responding to Commerce's questions.[35]  As discussed above, on December 20, 2020, and February 16, 2021, Meihua availed itself of the opportunity extended by Commerce to seek clarification concerning questions contained in the initial section C questionnaire and the first section C and D supplemental questionnaire.[36]  In contrast, upon receiving Commerce's initial questionnaire, Meihua did not divulge the existence of [                                                        ], did not explain how the information therein impacted its ability to respond accurately, and did not avail itself of the opportunity to seek clarification from Commerce.  Most importantly, at no point in the review did Meihua justify or rectify its actions, when given the opportunity to do so.

Commerce did not issue a further supplemental questionnaire on the issue of Meihua's incorrect reporting of U.S. duties after submitting its June 4, 2021, supplemental questionnaire response.  Commerce's decision was based on Meihua's reluctance to cooperate from the very beginning of the segment of the proceeding, through the impending deadline for the fully

---

[33] *See* Meihua's CR, Meihua's Supplemental CDSR and Meihua's June 4 CDSSR at certifications.
[34] As noted above, Commerce was not alerted to the inaccurate nature of Meihua's reported U.S. duties until the petitioner's comments submitted in advance of the *Preliminary Results* on July 14, 2021.  *See* Petitioner's Letter, "Pre-Preliminary Comments," dated July 14, 2021 (Petitioner's Pre-Prelim Comments).
[35] *See* Initial Questionnaire at 4.
[36] *See* December 20 Memorandum; *see also* February 16 Memorandum.

extended preliminary results.  As explained above, Meihua knew at the time of its initial

questionnaire response that its reported U.S. duties were incorrectly reported to Commerce.

Even in its June 4, 2021, supplemental questionnaire response, Meihua declined to explain its

reporting deficiencies, and simply provided the [                    ] and allowed the

information to stand on its own with no further explanation.  Meihua had numerous opportunities

to remedy its actions and create an accurate record, as is its burden.[37]

The circumstances in this case are similar to those in *Lightweight Thermal Paper from*

*Germany*, in which Commerce applied AFA to a respondent that intentionally withheld certain

home market transactions.[38]  There, on appeal, the U.S. Court of Appeals for the Federal Circuit

(Federal Circuit) upheld Commerce's application of AFA to the respondent.[39]  The Federal

Circuit held that there was "substantial evidence" that the respondent engaged in a transshipment

scheme, causing it to withhold information from Commerce.[40]  The Federal Circuit also noted

that the respondent did not reveal its transshipment scheme voluntarily, doing so after an

allegation of misconduct was put on the record.  Finally, the Federal Circuit held that Commerce

properly declined to accept a revised home market database after the deadline had passed for the

submission of new factual information.[41]

As with the respondents in *Lightweight Thermal Paper from Germany*, in this case,

Meihua provided [                              ][42] and Commerce, making it impossible

---

[37] *See Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1337 (Fed. Circ. 2016) (*Nan Ya*) (holding the burden of creating an adequate record lies with interested parties and not with Commerce).
[38] *See Lightweight Thermal Paper from Germany; Preliminary Results of Antidumping Duty Administrative Review; 2010-2011*, 77 FR 73615 (December 11, 2012), unchanged in *Lightweight Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 23220 (April 18, 2013) (*Lightweight Thermal Paper from Germany*).
[39] *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016) (*Papierfabrik*).
[40] *Id.*, 843 F.3d at 1379.
[41] *Id.*, 843 F.3d at 1384.
[42] *See* Meihua's June 4 SQR at Attachment I.

for the agency to conduct the review.  But unlike the respondent in *Lightweight Thermal Paper from Germany*, Meihua made no good faith effort to rectify its inaccurate reporting; Meihua submitted a revised U.S. sales database with no explanation of the discrepancies in its initial reporting.[43]

In *Papierfabrik*, the Federal Circuit held that the respondent's misconduct with respect to home market sales undermined the reliability of its original database.  As the Federal Circuit explained, "fraudulent responses as to part of submitted data may suffice to support a refusal by Commerce to rely on any of that data in calculating the antidumping duty."[44]  Consistent with the Federal Circuit's decision, we find that Meihua's actions, in this case, call into question the accuracy of the company's entire response.  Meihua [

].[45]  Although Meihua explained that its U.S. duties were incorrectly calculated, Commerce has no way to ensure the accuracy or reliability of the company's U.S. sales database.

Further, even if Commerce had requested that Meihua provide correct U.S. duties, by the company's own admission, it would not have been able to do so.[46]  According to Meihua, it would be unable to provide Commerce with any reliable information until "[

];" unfortunately for Meihua, Commerce cannot conduct its proceedings subject to a respondent's indeterminate time-frame.[47]  It was Meihua's responsibility to inform Commerce that it lacked accurate U.S. duty information early in the proceeding such that interested parties could comment, and Commerce could arrive at a methodology with which

---

[43] *Id.* at Exhibit SC2-1.
[44] *See Papierfabrik*, 843 F.3d at 1379 (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1355-57 (Fed. Cir. 2015)).
[45] *See* Meihua's June 4 SQR at Attachment I.
[46] *Id.* at Exhibit SC2-5.
[47] *See* Meihua's Case Brief at i.

to calculate export prices using the information available to Meihua.[48]  Given Meihua's uncooperative actions, Commerce was unable to analyze record evidence and develop a methodology that would allow for the accurate calculation of U.S. duties.  Indeed, Meihua's actions left Commerce bereft of accurate data rather than simply having alerted the agency at the outset of the review; thus, Commerce conducted its review under false pretenses – that Meihua's questionnaire responses were complete and accurate.

In the *Remand Order*, the CIT explained that Commerce has no authority to apply AFA unless it "satisfy{ies} its statutory obligation provide notice and an opportunity to remedy any deficiency."[49]  As the Federal Circuit has elaborated, however, the statutory directive of section 782(d) the Act cannot apply where "{the} 'deficiency' was not due to an error or misunderstanding, but to intentional misconduct."[50]  Indeed, the Federal Circuit has held that Commerce is entitled to make adverse inferences, where the gap in the record is created as the result of a respondent's knowing failure to report.[51]  On remand, we find that the "deficiency" at issue was not due to an error or misunderstanding, but a result of Meihua's intentional misconduct – the company knowingly certified and submitted inaccurate information, which made it impossible for Commerce to conduct its review.[52]

The Federal Circuit's holding in *Deacero* is also instructive in this case.  In *Deacero,* the Federal Circuit examined Commerce's application of AFA to a respondent that made unsolicited changes to its cost database that the respondent described as "minor."[53]  Commerce ultimately determined that the respondent was unable to substantiate the changes it made to its cost

---

[48] *See Nan Ya*, 810 F.3d at 1337.

[49] *See Remand Order* at 17 (citing section 782 of the Act).

[50] *See Papierfabrik*, 843 F.3d at 1378.

[51] *Id.*, 843 F.3d at 1379.

[52] *See* Meihua's CR; Meihua's Supplemental CDSR; and Meihua's June 4 CDSSR at "Certifications."

[53] *See Deacero S.A.P.I. De C.V., Deacero USA, Inc., v United States*, 996 F.3d 1283 (Fed. Cir. 2021).

database and that the changes the respondent characterized as minor, in fact impacted the costs associated with certain control numbers that drove the margin calculation.  In upholding Commerce's application of AFA, the Federal Circuit explained that the respondent's failing was not that it had submitted corrected information; but that it had failed to timely notify Commerce of the nature and import of the corrections and to adequately explain and support them.[54]

As with the respondent in *Deacero*, Meihua failed to timely notify Commerce that it had filed a [                    ] with CBP, which impacted its ability to report accurate entered value and U.S. duty information in its U.S. sales database.  When Meihua finally made an attempt to rectify its shortcomings, it did so at Commerce's behest, and under protest.[55]  Further, Meihua made no effort to explain its reporting methodology or provide Commerce with an alternative to using the U.S. duties that it reported.  As the Federal Circuit has held, AFA is warranted "not only when an interested party fails to respond, but also where 'it is reasonable for Commerce to expect that more forthcoming responses should have been made.'"[56]

Here, it was not unreasonable for Commerce to expect Meihua to have been more forthcoming with its responses; the company should have provided a full and detailed explanation of how it reported U.S. duties well before the preliminary results.  Indeed, had Meihua disclosed to Commerce the situation involving the [                    ] and indicated its difficulty in reporting U.S. duties prior to the deadline for the submission of the initial questionnaire, provided detailed information on the U.S. duties in its original questionnaire response, or even at a reasonable time thereafter, Commerce may have been able to issue further supplemental questionnaires, allow parties to comment on a proposed methodology, requested

---

[54] *Id.*, 996 F.3d at 1288.
[55] *See* Commerce May 18 Supplemental; and Meihua's June 4 SQR.
[56] *See Deacero*, 996 F.3d at 1298 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003)).

further information, *etc*.  By submitting the [                    ] (containing information on deficiencies in Meihua's U.S. sales database) less than two months before the preliminary results signature date and without any explanation, Meihua precluded Commerce not only from further consideration of the issue, but also from conducting its proceeding.  We note that Meihua's shortcomings were first highlighted by the petitioner in a series of filings culminating on July 14, 2021.[57]  Indeed, Meihua was reluctant to provide accurate information, as evidenced by the 262-day gap between the filing of the [                    ] with [    ] and the filing, under protest, of the [                    ] with Commerce.

Finally, the process of issuing preliminary results in an administrative review is labor intensive, requiring hours of analysis and document production.  Commerce must prepare a *Federal Register* notice, various preliminary memoranda, draft customs instructions and generate computer programs.  To issue supplemental questionnaires to an uncooperative respondent so late into the review, allow parties to rebut with factual information, and to analyze all submitted information, would have made it impossible for Commerce to satisfy its statutory obligations.

**B.  Commerce's Determination Not to Rescind the Review of Deosen Biochemical**

In the underlying review, Deosen provided evidence that Deosen Biochemical had no shipments during the POR.[58]  Commerce did not contest this fact.  Rather, Commerce explained that, because the company was found to comprise the single entity Deosen, consistent with

---

[57] *See* Petitioner's Pre-Prelim Comments.
[58] *See* Memorandum, "Antidumping Duty Administrative Review of Xanthan Gum from the People's Republic of China:  Automated Commercial System Shipment Query," dated September 23, 2020 (CBP Data).

agency practice, it would not rescind the review of the company.[59]

The CIT remanded to Commerce to reconsider its decision not to rescind the review of Deosen Biochemical, holding that the agency abused its discretion by failing to conduct a collapsing analysis.[60]

**Analysis**

Consistent with the *Remand Order*, we have reconsidered Commerce's decision: (1) to collapse Deosen Ordos with Deosen Biochemical; and (2) not to rescind the review of Deosen Biochemical. As detailed below, given that Deosen Ordos and Deosen Biochemical comprise the Deosen single entity, it would be inappropriate to rescind the review of Deosen Biochemical.

As an initial matter, Commerce collapsed Deosen Ordos and Deosen Biochemical into a single entity in prior administrative reviews of the order, a decision which had not been contested or revisited. Indeed, Commerce's collapsing criteria and analysis are first detailed in the *Fifth Administrative Review*.[61] It is Commerce's practice to presume that companies continue to comprise a single entity when that finding has been made in a prior segment of the proceeding. Even so, on remand, consistent with the *Remand Order*, and under protest, we have placed our collapsing analysis on the record of this review to serve as a "collapsing analysis."[62]

Specifically, Commerce determined that Deosen Biochemical and Deosen Ordos are

---

[59] *See 2019-20 Final Results* IDM at Comment 2; *see also Xanthan Gum from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2017-2018*, 84 FR 26813 (June 10, 2019) (*2017-18 Preliminary Results*), and accompanying PDM at 6 (citing Memorandum, "Deosen Biochemical Ltd. and Deosen Biochemical (Ordos) Ltd. Affiliation and Single Entity Status," dated June 4, 2019 (Deosen Collapsing Memorandum)), unchanged in *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 84 FR 64831 (November 25, 2019) (*2017-18 Final Results*) (collectively, *Fifth Administrative Review*).
[60] *See Remand Order* at 9.
[61] *See 2017-18 Preliminary Results* PDM at 6 (citing Deosen Collapsing Memorandum), unchanged in *2017-18 Final Results*.
[62] *Id.*

affiliated pursuant to 19 CFR 351.401(f).  Further, Commerce found that both Deosen

Biochemical and Deosen Ordos have production facilities that can produce similar or identical

merchandise.  Finally, Commerce found that there existed the significant potential for

manipulation of price or production of xanthan gum.[63]  Commerce has not revisited that decision,

and no interested party, including Deosen, requested the agency to do so.

Absent such a request and the submission of factual information supporting its claim,

Commerce will not revisit prior collapsing determinations.  This practice was reflected in the

*Initiation Notice*:

> In general, Commerce has found that determinations concerning whether particular
> companies should be "collapsed" (*e.g.*, treated as a single entity for purposes of
> calculating antidumping duty rates) require a substantial amount of detailed
> information and analysis, which often require follow-up questions and analysis.
> Accordingly, Commerce will not conduct collapsing analyses at the respondent
> selection phase of this review and will not collapse companies at the respondent
> selection phase unless there has been a determination to collapse certain companies
> in a previous segment of this AD proceeding (*e.g.*, investigation, administrative
> review, new shipper review, or changed circumstances review).  For any company
> subject to this review, if Commerce determined, or continued to treat, that company
> as collapsed with others, Commerce will assume that such companies continue to
> operate in the same manner and will collapse them for respondent selection
> purposes.[64]

The *Initiation Notice* discusses Commerce's practice of continuing to apply the results of

a collapsing determination from a prior segment of the proceeding absent information to the

contrary in the context of respondent selection.  Further, along with Commerce's long-standing

practice to carry prior collapsing determinations forward, and absent new information, Deosen

Biochemical and Deosen Ordos were reasonably aware of the need to request that Commerce re-

evaluate the collapsing determination of Deosen and provide record information demonstrating a

change in the factors referenced above, if applicable.

---

[63] *See 2017-18 Preliminary Results* PDM at 6-7; and Deosen Collapsing Memorandum.
[64] *See Initiation Notice*, 85 FR at 54983.

During the 2019-2020 review, no interested party, including Deosen, requested that Commerce revisit its collapsing determination.  Further, during the 2019-2020 review, no interested party, including Deosen, submitted information on the record challenging Commerce's collapsing determination.  Absent record information and argument,[65] Commerce was under no statutory or regulatory obligation to revisit its collapsing determination.[66]  And most significantly, given these facts, there is no evidence on the record of the underlying proceeding to allow for Commerce to conduct its analysis anew.

### C. Commerce's Calculation of the Separate Rate Applicable to Deosen and Jianlong

The CIT remanded to Commerce to reconsider the calculation of the separate rate "based on any changes … to Meihua's rate."[67]  Because we have made no changes to Meihua's rate on remand, no change to the separate rate calculated in the underlying review (*i.e.*, 77.04 percent) is warranted.[68]

## IV.   INTERESTED PARTY COMMENTS

As noted above, on June 23, 2023, Deosen, Jianlong, and Meihua submitted comments on the Draft Results.[69]  We address these comments below.

### A. Commerce's Application of AFA to Meihua

*Interested Party Comments*:

*Meihua*[70]

- The Court's opinion rejected Commerce's ability to apply AFA to Meihua.  Thus, the

---

[65] *Id.*
[66] *See China First Pencil Co., Ltd. v. United States*, 427 F. Supp. 2d 1236, 1239-41 (CIT 2006) (*China First Pencil*) (sustaining Commerce's decision to continue collapsing companies which were found to be collapsed in a previous review, where plaintiff "failed to meet its burden of establishing that the facts and circumstances had changed sufficiently to warrant a re-examination of Commerce's decision.").
[67] *See Remand Order* at 20-21.
[68] *See 2019-20 Final Results*, 87 FR at 7105.
[69] *See generally* Deosen Brief; Jianlong Brief; and Meihua Brief.
[70] *See* Meihua Draft Results Comments.

Court remanded not for a new justification for applying AFA, but for reconsideration of its decision in light of the Court's ruling that Commerce has no authority to apply AFA.

- Commerce was ordered to reconsider the final results with the backdrop of no authority to apply adverse facts and inferences under section 776 of the Act. Commerce should have calculated the AD margin for Meihua based upon the information submitted by Meihua during the administrative review.

- To the extent Commerce believes there is any deficiency in the information provided by Meihua, it could have – during the remand proceeding – sent a supplemental questionnaire to Meihua requesting that information. Commerce did not seek additional information from Meihua during the remand proceeding, thus confirming that the administrative record is sufficiently complete for purposes of calculating an AD margin for Meihua. The Draft Results simply disregard the Court's remand order in favor of what Commerce wishes the outcome would have been.

- Rather than calculate an AD margin for Meihua, Commerce followed the old refrain, "second verse, same as the first." The discussion in the Draft Results merely rehashes the same rationale found in the decision memorandum accompanying the final results and briefing before the Court, all of which the Court rejected. Meihua submitted counterarguments to Commerce's rejected rationale in its case brief before Commerce and in briefing before the Court. These submissions are included here as exhibits and the arguments are hereby incorporated by reference into these comments on the Draft Results.

- Meihua provided accurate and complete responses to the precise requests for information in Commerce's questionnaires and supplemental questionnaires.
  - o To the extent Commerce wanted different information, it had sufficient time to request additional information.
  - o To the extent Commerce felt that two months was not sufficient time, Commerce is not constrained by the deadline for the preliminary determination. Commerce has completed investigation and analysis in post-preliminary results memoranda in other proceedings, and there was no bar to Commerce doing the same in this review.

- To Commerce's rehashed arguments, the Draft Results add some discussion of two-year-old inapposite case law that Commerce could have raised in its briefing before the Court but decided to leave out of its briefing before the Court. In that case, Deacero, which had been found circumventing the order, added unsolicited information in a supplemental questionnaire response that significantly changed Deacero's U.S. sales databases without explanation, describing the unsolicited information as minor corrections. Commerce issued a post-preliminary supplemental questionnaire – that is, after the preliminary results issued – for Deacero to explain the changes. Deacero explained that its changes were because its costs were reported based on planned production, contradicting its initial explanation that its costs were based on actual costs. Commerce found that the contradicting explanation was connected to significant and disproportional changes to costs submitted without sufficient explanation, and that it was just learning – after the preliminary results - that Deacero had misrepresented the basis for its reporting in the initial questionnaire response.

- In contrast to the circumventer's misleading, misrepresenting, and contradicting explanations in that case, here, Meihua provided complete and accurate responses to Commerce's precise requests for information.
  - Although Commerce issued a postpreliminary supplemental questionnaire there, Commerce did not do so here, despite acknowledging that it knew months before the preliminary results were due about what it later claimed were deficiencies preventing calculation of Meihua's AD margin.  Thus, the Draft Results fail to provide any new information or argument that could justify its refusal to follow the Court's clear order on remand.

**Commerce's Position:**

Commerce continues to find that its application of AFA to Meihua is appropriate.  As an initial matter, we disagree with Meihua that the *Remand Order* rejected, as a matter of law, Commerce's ability to apply AFA to the company on remand.  Contrary to Meihua's claim, the *Remand Order* instructed Commerce to "reconsider the application of adverse facts available to Meihua"[71] and contains *no instruction* precluding Commerce from assigning an AFA rate to Meihua.

We also disagree with Meihua that Commerce's decision not to issue a supplemental questionnaire to the company on remand confirms that the underlying administrative record was sufficient for purposes of calculating a non-AFA margin for Meihua.  In the Draft Results, Commerce explained that Meihua failed to timely disclose the existence of a [

] that it had filed with [   ], and knowingly submitted inaccurate and false information to Commerce in its initial and supplemental questionnaire response, and, as a result, "left Commerce bereft of accurate data."[72]  Commerce further elaborated on its decision not to issue an additional supplemental questionnaire to Meihua given the company's belated submission of the [                              ] that laid bare the full scope of respondent's

---

[71] *See Remand Order* at 25.
[72] *See* Draft Results at 10.

scheme.[73]  Consequently, Meihua's claim that Commerce's decision constitutes a tacit admission is nothing short of disingenuous.

Meihua's attempts to minimize the implications of the Federal Circuit's decision in *Deacero* are also without merit.  As an initial matter, contrary to Meihua's claim,[74] neither Commerce's decision to apply AFA to the respondent in *Deacero*,[75] nor the Federal Circuit's ruling upholding that decision, reference Commerce's prior circumvention finding as a basis for the agency's ultimate conclusion.[76]  More importantly, the fact that *Deacero* is a "two-year old" decision[77] is immaterial; *Deacero* is not only precedential, but also instructive.  And despite Meihua's claims,[78] its behavior in this case was no different than that of respondent's in *Deacero*.

Indeed, as with the respondent in *Deacero*, Meihua failed to timely notify Commerce that it had filed a [                    ] with CBP, which impacted its ability to report accurate entered value and U.S. duty information in its U.S. sales database.  As explained in the Draft Results, [                    ] showed that Meihua:  (1) [

].[79]  The Draft Results also elaborate that, "{d}espite conceding [

],[80] Meihua:  (1) concealed this fact from Commerce in its initial

---

[73] *Id.* at 8.
[74] *Id.* at 5.
[75] *See Carbon and Certain Alloy Steel Wire Rod from Mexico:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 FR 23190 (May 22, 2017), and accompanying IDM.
[76] *See Deacero*, 996 F.3d 1283.
[77] *See* Meihua Draft Results Comments at 5.
[78] *Id.* at 6.
[79] *See* Draft Results at 5.
[80] *Id.* (citing Meihua's Letter, "Response to Second Supplemental Section C/D Questionnaire," dated June 4, 2021 (Meihua's June 4 SQR) at Exhibit SC2-5).

section A questionnaire response; and (2) included erroneous information (*i.e.*, [

]) in its section C response."[81]  Thus, it simply cannot be said that Meihua

provided "accurate" and "complete" responses to Commerce's initial and supplemental

questionnaires or that Commerce had the necessary information at its disposal to calculate an

accurate and reliable margin based on the information and data Meihua provided to Commerce in

the underlying review.

We also disagree with Meihua that because Commerce issued a post-preliminary

questionnaire to the respondent in *Deacero*, Commerce was obligated to have done the same

before applying adverse inferences to Meihua.[82]  As *Deacero* confirms, *the burden* is *on the*

*respondent* to submit revisions and corrections to Commerce in a manner that is "timely."[83]

"Timely" disclosure in this context means as soon as the respondent discovers the inaccuracies.

"Timely" disclosure does not mean, as Meihua contends, withholding information relevant to

Commerce's analysis and margin calculations and belatedly divulging schemes under protest,

and only after Commerce becomes aware of said schemes.  In upholding Commerce's

application of AFA in *Deacero* the Federal Circuit made note of the respondent's "withholding"

of information requested by Commerce:

> Deacero, therefore, "with{held} {requested} information," "fail{ed} to provide
> {necessary} information by the deadlines for submission of the information," and,
> thereby, "significantly impede{d}" the administrative review, such that Commerce
> properly "use{d} facts otherwise available."[84]

and;

---

[81] *Id*. at 5 (citing Meihua's Letter, "Response to Supplemental Section C/D Questionnaire, dated March 8, 2021 (Meihua's Section C Response)).
[82] *See* Meihua Draft Results Comments at 5.
[83] *See Deacero*, 996 F.3d at 1288.
[84] *Id*., 996 F.3d at 1296.

> Accordingly, Commerce's decision to apply AFA to Deacero, based on Deacero's, at best, inconsistent representations, and failure to timely explain and meaningfully support those representations, is supported by substantial evidence.[85]

As explained in the Draft Results, Meihua knew of the situation involving its scheme at the outset of the review.[86]  Meihua concedes that it was aware of the inaccurate nature of its reporting.  Meihua should have "timely" disclosed the scheme to Commerce in the run-up to the submission of its initial questionnaire response or in its initial questionnaire response.  As explained in the Draft Results, "{i}t was Meihua's responsibility to inform Commerce that it lacked accurate U.S. duty information early in the proceeding such that interested parties could comment, and Commerce could arrive at a methodology with which to calculate export prices using the information available to Meihua."[87]  Because Meihua failed to do so, Commerce was left unaware of the true nature of respondent's U.S. sales data.

Furthermore, although Meihua criticizes Commerce for not issuing an additional supplemental questionnaire "if it believed Meihua's response was deficient,"[88] Commerce is not required to issue deficiency questionnaires to parties that intentionally withhold information from the agency.  Indeed, the Federal Circuit has held that "nothing in that language compels Commerce to treat intentionally incomplete data as a deficiency and then to give a party that has intentionally submitted incomplete data an opportunity to remedy as well as to explain."[89]  Meihua fails to distinguish the Federal Circuit's holding in *Papierfabrik*, and, again, does not argue that it was unaware of its inaccurate reporting.  Consequently, it is unclear how Commerce could have investigated the nature of deficiencies in Meihua's reporting when such deficiencies

---

[85] *Id.*, 996 F.3d at 1297.
[86] *See* Draft Results at 8.
[87] *Id.* at 10 (citing *Nan Ya*, 810 F.3d at 1337 (holding the burden of creating an adequate record lies with interested parties and not with Commerce).
[88] *See* Meihua Draft Results Comments at 7.
[89] *See Papierfabrik*, 843 F.3d at 1379 (quotations removed).

were only known to the company.  In short, we disagree with Meihua that our application of AFA to the company was inconsistent with law – *i.e.*, that Commerce was required to issue a deficiency questionnaire to Meihua.  Accordingly, we continue to apply total AFA to Meihua.

### B. Commerce's Determination Not to Rescind the Review of Deosen Biochemical

***Interested Party Comments*:**

***Deosen***[90]

- Commerce failed to follow the *Remand Order* and to adequately justify its decision with respect to Deosen in the Draft Results.
- Commerce did not comply with the Court's explicit instructions that it should (1) perform a collapsing analysis pursuant to 19 CFR 351.401(1); and (2) determine whether Deosen Biochemical Ltd. was an exporter with no shipments during the POR, and accordingly, whether the review of Deosen Biochemical Ltd. should have been rescinded.[91]
- In the Draft Results, Commerce continued to justify its decision of not revising the prior collapsing determination based on a paragraph from the Initiation Notice.[92]  However, the reference in the *Initiation Notice* concerning collapsed entities pertains to respondent selection only, and not broadly for the purposes of the review or whether Commerce should rescind the review of a company without shipment.
- Commerce discusses the treatment of collapsed entities for respondent selection purposes under the "Respondent Selection" which does not mention collapsed entities at all under the separate "Notice of No Sales" section.[93]
- Commerce did not give notice to Deosen that the two Deosen entities would remain collapsed for the purposes of this review.  Commerce's reliance on *China First Pencil* to maintain its position that Commerce need not have revisited their collapsing determination is misplaced.  In that case, the Court found that plaintiffs failed to exhaust administrative remedies and that they should have challenged Commerce's collapsing decision during the administrative comment period following publication of the *Preliminary Results*.[94]
  - In the instant *Preliminary Results*, Commerce specifically addresses Fufeng and Meihua's status as collapsed entities but did not state that it would continue to consider Deosen Biochemical, Ltd. and Deosen (Ordos) Biochemical, Ltd. as collapsed entities.  Following the *Preliminary Results*, Deosen challenged Commerce's preliminary decision not to rescind the review with respect to Deosen Biochemical, Ltd., which had no shipments during the period of review. This further supports the Court's conclusion that Commerce's failure to conduct a collapsing analysis for the POR was an abuse of discretion.

---

[90] *See* Deosen Draft Results Comments.
[91] *Id.* at 2.
[92] *Id.* at 4 (citing *Initiation Notice*; and Draft Results at 15)).
[93] *Id.*
[94] *See* Deosen Draft Results Comments at 4 (citing *China First Pencil*, 427 F. Supp. 2d at 1239-41).

- o The Court specifically ordered Commerce to determine whether Deosen Biochemical, Ltd. was an exporter with any shipments during the POR, and whether Deosen Biochemical, Ltd.'s review should have been rescinded.
- Commerce failed to justify why it can ignore its regulations (19 CFR 351.213(d)(1)) and practice under which Commerce rescinds a review when an exporter had no shipments during the POR. This is problematic because the collapsing analysis focuses on companies as producers, whereas in administrative reviews, Commerce focuses on determining the dumping margins of exporters.

**Commerce's Position:**

Commerce continues to find that, because no interested party requested that Commerce conduct a collapsing analysis of Deosen Biochemical Ltd. and Deosen (Ordos) Biochemical Ltd. (collectively, Deosen), Commerce properly followed its long-standing practice to continue to treat companies as collapsed when Commerce has determined to collapse them in a prior proceeding. Further, Commerce finds that one of the entities that comprise the Deosen single entity made shipments of subject merchandise to the United States during the POR and, thus, that Commerce properly did not find that the collective Deosen entity made no shipments during the administrative review.

Despite Deosen's claims to the contrary, absent an argument on the record accompanied by supporting evidence, Commerce is not obligated, and has no reason, to conduct a collapsing analysis of a previously collapsed entity. Deosen had numerous opportunities to request that Commerce conduct a new collapsing analysis during the underlying administrative review; Deosen failed to request that Commerce do so. Neither during the course of the administrative review leading up the *Preliminary Results*, nor as a part of its case briefs, did Deosen request Commerce to conduct a collapsing analysis or point to record evidence to support any such contention. In a review it is incumbent on interested parties to present evidence of a change in circumstances of a company's ownership or business relationship with collapsed entities and request a new collapsing analysis. Indeed, to conduct a collapsing analysis, Commerce requires

record evidence demonstrating that the circumstances in existence during Commerce's collapsing determination have changed and warrant Commerce to conduct a new collapsing determination.  No such request was made and no such record information exists in this proceeding.

Regarding Deosen's argument concerning Deosen Biochemical Ltd., and whether it made shipments during the POR, we find that Deosen's argument is not on point.  As explained in the Draft Results, because Deosen Biochemical, Ltd. and Deosen (Ordos) Biochemical Ltd. are collapsed entities, as long as one of these entities made shipments during the POR, it is irrelevant if the other did not.  Commerce's collapsing determination found that both Deosen Biochemical, Ltd. and Deosen (Ordos) Biochemical, Ltd. are considered to be one collapsed entity for AD purposes.  Commerce made this decision based on factors such as intertwined business operations, shared management and shared cost and pricing information.[95]  Commerce collapses entities due to the ability of entities that are able to shift production between companies to circumvent the discipline of Commerce's AD orders.  Accordingly, because Commerce determined that Deosen Biochemical, Ltd. and Deosen (Ordos) Biochemical, Ltd. are a single entity for AD purposes, the collapsed entity *as a whole* is found to have shipments during the POR even though only one company comprising the entity had shipments during the POR.

Finally, we disagree with Deosen that Commerce was obligated to note Deosen's collapsed entity status along with that of Fufeng and Meihua in the *Preliminary Results*. Commerce referenced the collapsed entity status of Fufeng and Meihua because they were *mandatory respondents* in the underlying proceeding; Commerce is not obligated to reference the collapsed status of companies not selected for individual examination.  Indeed, since our

---

[95] *See* Deosen Collapsing Memorandum.

collapsing determination for Deosen, we have consistently referred to Deosen as "Deosen

Biochemical and Deosen Biochemical (Ordos) Ltd. (collectively, Deosen)."[96]  As for Deosen's

argument that the language in Commerce's *Initiation Notice* applies only to respondent selection,

this is a distinction without a difference.  Indeed, it is nonsensical for Commerce to collapse

Deosen for the purposes of respondent selection, but not other, subsequent stages, of its review;

respondent selection allows Commerce to gauge the number of shipments made by a given

entity, which is why collapsing determinations occur at the respondent selection stage.  Deosen

failed to present evidence of changed circumstances, or otherwise request a collapsing analysis at

the respondent selection stage, or otherwise.  Because the administrative record shows that

Deosen is a single entity, there is no need to conduct further collapsing analysis for the purposes

of this proceeding.

### C.  Commerce's Calculation of the Separate Rate Applicable to Deosen and Jianlong

***Interested Party Comments***:

***Jianlong***[97]

- Jianlong disagrees with Commerce's decisions not to:  (1) recalculate the separate rate assigned to Jianlong; and (2) address the issue of the appropriate separate rate at all in the Draft Results.[98]
- The CIT instructed Commerce to reconsider the recalculation of the Jianlong's separate rate based on any changes to Meihua's rate.  That Commerce preliminarily has made no changes to Meihua's rate does not relieve Commerce from the obligation of reconsidering the calculation of Jianlong's separate rate.
- Commerce claimed that it did not find that the separate rate was not reasonably reflective of the potential dumping margins of the separate rate respondents such that it could

---

[96] *See Xanthan Gum from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, and Partial Rescission; 2018–2019*, 85 FR 74686 (November 23, 2020), unchanged in *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 FR 16189 (March 26, 2021); *see also Xanthan Gum from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 FR 42781 (August 5, 2021), unchanged in *2019-20 Final Results.*
[97] *See* Jianlong Draft Results Comments.
[98] *Id.* at 1-2.

depart from the "expected method" of averaging Fufeng's *de minimis* rate with Meihua's rate derived entirely from an adverse inference.[99]

- Commerce's position is misplaced. Commerce's justification for reliance on an average approach is inapplicable with respect to Jianlong. Although Commerce claimed in its *Final Results* that it could rely on the history of companies' dumping margins to inform its separate rate calculation, this does not apply to Jianlong because Jianlong's only calculated rate in an administrative review was 9.30 percent. Thus, Commerce never previously determined that Jianlong was uncooperative or subject to government control such that an adverse inference rate or country-wide dumping rate might reflect Jianlong's actual level of dumping.

- Unlike the other respondents, there is no history of Jianlong receiving a dumping margin based on total facts available. Therefore, there is no basis for Commerce's rationale that evidence of non-cooperation from previous reviews of xanthan gum from China show that a dumping margin of 77.04 percent reasonably reflects the potential likelihood of Jianlong dumping.[100]

- In *Bosun III*, Commerce accounted for previously calculated rates for a separate rate respondent, finding some above and below the separate rate. Based on this finding, Commerce found it reasonable to apply to the respondent a separate rate based on an average of zero and AFA.[101] Commerce did not follow *Bosun III* in its final results, instead finding that it could disregard previously calculated rates due to the history of non-cooperative respondents in this proceeding. The calculated rates of all mandatory respondents from four previous administrative reviews demonstrate that the calculated rates have not exceeded 9.30 percent and been as low as zero on numerous occasions.[102] Any history of non-cooperation by mandatory respondents predates the recent history of this proceeding.

- Commerce has failed to explain why it is reasonable to conclude, based on this far-removed history of AFA, that Meihua's total AFA rate continues to be equally relevant to the potential dumping behavior of the cooperating separate rate respondent

- In *Yangzhou Bestpak*, the Federal Circuit held that a rate resulting from a simple average of a total AFA rate and a *de minimis* rate may be unreasonable where data does not support Commerce's determination that the resulting separate rate is reasonably reflective of the separate rate respondents' dumping margins.[103]

- The assumption that the margins of individually-investigated respondents reflect all exporters' current dumping margins breaks down when the margin of one of the investigated respondents is not calculated from its own data, but derived via an adverse inference that cannot be applied to cooperating non-selected respondents.

  o Where non-selected respondents have cooperated in an administrative review, it is not reasonable for Commerce to assume that a rate that is the product of an adverse inference is equally reflective of the non-selected respondents' margins without some independent data corroborating that conclusion. That the separate rate respondents, including Jianlong, cooperated while Meihua did not make it

---

[99] *Id.* at 2.
[100] *Id.* at 3.
[101] *Id.* at 4 (citing *Bosun Tools Co. v. United States*, 493 F. Supp. 3d 1351, 1357 (CIT 2021) (*Bosun III*)).
[102] *See* Jianlong Draft Results Comments at 5.
[103] *Id.* (citing *Yangzhou Bestpak*, 716 F.3d at 1378).

unreasonable for Commerce to conclude that Meihua's rate is equally representative of the cooperative separate rate respondents' potential dumping margins. Moreover, Commerce has made no effort to explain the continued equal relevancy of the AFA rate despite its non-contemporaneity to the cooperating separate rate respondents in the present review.

- Federal Circuit and CIT precedent demonstrates that, while the SAA contemplates the use of an average of an AFA rate and zero or *de minimis rates* (in investigations), this does not absolve Commerce from ensuring that the separate rate assigned to Jianlong reasonably reflects Jianlong's potential dumping margin or from rationally connecting the record evidence with its final conclusions.[104]

    o Here, where the 77.04 percent separate rate assigned by Commerce was exceptionally larger than the zero rate calculated for the lone cooperative mandatory respondent, and where the calculated results of previous administrative reviews showed far lower levels of dumping, Commerce must undertake a substantially more rigorous examination.

    o Commerce had time prior to its preliminary results to collect Jianlong's sales and costs information. In fact Jianlong submitted ownership, sales and financial information. Thus, at the same time that Commerce became aware of the extent of Meihua's alleged non-cooperation, Commerce was collecting substantial information from Jianlong, and could have requested additional information related specifically to Jianlong's level of dumping.[105]

**Commerce's Position:**

Commerce continues to find that, given there was no change to Meihua's rate on remand, no change to the separate rate calculated in the underlying review (*i.e.*, 77.04 percent) is warranted.[106]

While Jianlong argues that it has received a rate of 9.30 percent that is not reasonably close to the separate rate of 77.04 percent, the separate rate in the underlying administrative review applies to both Jianlong and Deosen. Accordingly, Commerce must consider the dumping history of all separate rate companies. In its *Final Results*, Commerce found that Deosen received an AFA rate of 154.07 in the 2013-2014 and 2014-2015 administrative reviews and the separate rate companies received the simple average of the mandatory respondents' rates,

---

[104] *See* Jianlong Draft Results Comments at 6 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA)).

[105] *See* Jianlong Draft Results Comments at 6-7.

[106] *See Final Results*, 87 FR at 7105.

*i.e.*, 77.04 percent, the same rate assigned in this administrative review.  Further, out of the six prior administrative reviews of the order on xanthan gum from China, Deosen has received an AFA rate of 154.07 two out of the four times it was selected as a mandatory respondent.  Moreover, out of the four proceedings in which Deosen was chosen as a mandatory respondent, Commerce calculated a zero or *de minimis* rate only once.[107]  Thus, there is a history of dumping for the separate rate companies in this proceeding.

Further, even if Commerce were to exclude Deosen from its analysis of past dumping activity in corroborating the separate rate, the lack of any calculated rate for Jianlong makes such an analysis impossible.  While Jianlong argues that it has no history of being uncooperative or of receiving margins above 9.30 percent, there is a lack of record evidence regarding Jianlong's actual selling experience in the United States.  Absent any evidence of Jianlong's selling activity in the United States, Commerce only has the previous margin history of all other separate rate companies to consider.  As such, and as described above, Commerce finds that there is a history of dumping margins both above and below the 77.04 percent separate rate applied in this administrative review.

Finally, if Jianlong wanted a rate other than that established for the separate rate companies, it could have requested voluntary treatment and supplemented the record with information with which Commerce could calculate a company-specific separate rate.  But Jianlong did not, and now asks for Commerce to do so without a proper request and without necessary information on the record.  Indeed, unless non-selected respondents voluntarily supply information to Commerce, which Commerce can either accept or decline, the only information

---

[107] *See Final Results* IDM at Comment 1.

on the record would be the information that led Commerce to assign the rates to the mandatory respondents.[108]

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the CIT's *Remand Order*, Commerce has reconsidered its:  (1) application of AFA to Meihua; (2) decision not to rescind the review of Deosen Biochemical, and, in doing so, reconsidered whether Deosen Biochemical and Deosen Ordos should be collapsed into a single entity; and (3) calculation of the separate rate.[109]  Based on the foregoing explanations, we find that:  (1) Commerce's application of AFA to Meihua is appropriate; (2) because Deosen remains a single entity, Commerce's decision not to rescind its review of Deosen Biochemical is proper; and (3) consequently, Commerce need not recalculate the separate rate.

X 

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[108] *See* section 777A(c), and 19 CFR 351.213(f); *see also* 19 CFR 351.204(d); *Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357 (Fed. Cir. 2022) (holding that Commerce's use of a rate based entirely on AFA to calculate the all-others rate was reasonable).
[109] *See Remand Order* at 17, 20-21, and 24.